UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BRITNEY GOOCH, individually; and THOMAS IMPASTATO, individually,<br><br>Plaintiffs,<br><br>v.<br><br>LAS VEGAS BISTRO, LLC, dba LARRY FLYNT'S HUSTLER CLUB, a Nevada limited liability company; DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive,<br><br>Defendants. | Case No. 2:14-cv-02189-APG-PAL<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 43) |

  Plaintiffs Britney Gooch and Thomas Impastato bring federal and state race discrimination and retaliation claims arising from their employment at a strip club and bookstore. Gooch, a black former employee, alleges that she was suspended for discriminatory reasons, she complained, and she was eventually fired for discriminatory and retaliatory reasons. Impastato, a white former manager, alleges he was fired for refusing to follow directions to fire black employees. Defendant Las Vegas Bistro, LLC (Bistro) moves for summary judgment on the grounds that Gooch and Impastato have no direct evidence of discrimination and that any circumstantial evidence of discrimination is rebuffed by Bistro's legitimate, race-neutral reasons for the adverse actions against the plaintiffs.

  Genuine issues of material fact exist that preclude me from granting summary judgment. Gooch and Impastato offer direct evidence that there was discriminatory animus in the organization and that both of them opposed it. Both also raise serious questions as to whether discrimination or retaliation was the cause for adverse employment actions taken against them. I therefore deny Bistro's motion for summary judgment.

/ / / /

## I. BACKGROUND

### A. *Impastato's employment at Bistro*

Impastato was hired by Bistro in June 2011 as a "floor manager" and was promoted three months later to "bar manager." ECF No. 48-7 at 3. Impastato had general managerial authority over Gooch and other employees, including responsibility for disciplinary "write-ups" and suspensions. ECF No. 48 at 5. The parties disagree whether Impastato had full authority to hire and fire employees. *See, e.g.*, ECF Nos. 43 at 8; 48 at 8. Impastato explains that he got along well with his colleagues and received a positive informal performance review from an outside consultant on May 10, 2012. *See* ECF No. 48 at 9 (Impastato was "doing extremely well and working hard to get [his] 'ducks in a row'").

On March 20, 2012, Bistro hired a white employee named Joseph Gause as a "team leader and manager." *Id.* at 3; ECF No. 48 at 4. Gause's position in the hierarchy was below Impastato, but he had supervisory authority over floor staff like Gooch. *Id.* at 7. According to Impastato, "Gause made it well known that he wanted to hire an all white staff and effectively terminate all the African-American day staff," at one point asking, "'[c]an we douche the day shift?'" ECF No. 48-7 at 3. Two other employees complained about Gause making a racially charged comment to one of them. *See* ECF Nos. 48-5 at 2; 48-4 at 5 ("Joe, I guess, not knowing that I was half black, . . . asked me, 'Let me know if you think this girl is too ghetto to work here.' And I said, "What do you mean by 'ghetto'?" And it's something about her hair weave, or the way she spoke, or her—he also mentioned something about her butt being really big."). One of those employees complained that Gause generally treated white staff better. ECF No. 48-4 at 2.

### B. *Discriminatory environment at Bistro leads to confrontation, Impastato's firing.*

Impastato alleges that at a managers' meeting on June 5, 2012, manager Lilian Pineda, Gause, and general manager Kelly Jones (Impastato's superior) "instructed [Impastato] to terminate the African-American day staff because, according to Gause, they 'did not want customers to come in and see a Black Cashier, a Black cocktail waitress, and a Black

bartender.'" ECF No. 48-7 at 4.  Impastato refused to fire any employees based on their race. *Id.* Pineda approached him after the meeting and instructed him to "take away the day staff's . . . hours so that the . . . employees would leave on their own." *Id.*  The day staff was all black at that time. *Id.*  Impastato states that during a meeting on June 12, 2012, Pineda again asked why Impastato had not yet fired the black staff, and Impastato responded with his belief that it was illegal to fire staff solely based on their race. *Id.*  Pineda again approached him after the meeting and "angrily directed [him] to terminate the African-American day staff or take the day staff off the schedule so that they would be economically forced to leave." *Id.* at 5.

The following day, Impastato was fired. *Id.*  When he asked why, general manager Jones replied, "Next time you are told to do something, do it." *Id.*  Impastato contested his firing with a formal charge of retaliation with the EEOC on August 6, 2012, and was issued a right to sue letter on October 7, 2014. *Id.*

### C. Bistro conducts an internal investigation.

On June 22, 2012, Bistro's attorney, Brad Shafer, investigated allegations of racial discrimination that had been made by multiple employees, which focused at least partially on Gause. ECF No. 48 at 5.  Shafer, in a letter to the EEOC, claimed to have resolved any potential issues with discrimination by reminding Gause of the company's discrimination policy, although he was not certain whether Gause actually made the statements that employees attributed to him. *See* ECF No. 48-3 at 4–6.

### D. Gooch's employment at Bistro

Gooch was hired by Bistro in October 2011 as a cashier and an attendant of Bistro's cash cage. ECF No. 48-10 at 3.  Gooch's time sheets show she worked a relatively consistent eight-hour work day, between three to five days per week. *See* ECF No. 43-2 at 26–30.  As an hourly employee she could not work unless management put her on the schedule. *See, e.g.*, ECF No. 48-10 at 6.  Gooch worked relatively uneventfully from her October 2011 start date through May 2012, receiving one minor disciplinary write-up in that period. ECF No. 43-2 at 18.

Gooch alleges that, from the beginning of her employment, she and other black employees were subject to stricter discipline, fewer breaks, and racially discriminatory remarks. *Id.* She contends that she was required to arrive well before her shift started at 4:00 p.m., but was threatened with discipline if she clocked in before then, whereas white employees were not. *Id.* at 4. She states that she and other black staff were assigned to the day shift, where employees received fewer tips. She also claims black staff were denied lunch breaks but other employees were treated more leniently. *Id.* at 4–5. She adds that on at least one occasion, she was denied a gratuity to which she was entitled in favor of a white employee. *Id.* at 3–4.

E. *Gooch's initial suspension and complaint to management*

On May 16, 2012, Gooch received a phone call from her sister, who was visiting from out of town, reporting that an unfamiliar, naked man was attempting to break into Gooch's residence while the sister was inside. ECF No. 48-10 at 5. Gooch immediately called the police. *Id.* Impastato, who was supervising her that day, instructed her to get off the phone. *Id.*[1] Gooch refused and stayed on the phone until she felt the situation was stabilized. *Id.* Impastato responded by giving her a write-up. ECF No. 43-2 at 15. Gooch was also told that she was suspended for two days. ECF No. 48-10 at 6.[2] When Gooch called two days later to inquire about her post-suspension schedule, she was told by assistant office manager Danielle Britt that she was not on the schedule. *Id.* That situation lasted for two weeks. *Id.* Gooch was finally placed back on the schedule when she threatened to elevate the issue to the owner of Bistro. *Id.*

Gooch alleges that non-black employees who committed similar disciplinary infractions received little or no discipline. *Id.* For example, a white cocktail server was on the phone for an hour in the bathroom but not disciplined. *Id.*

---

[1] Impastato states in his affidavit: "Knowing that [Bistro] was looking for any reason to terminate the African-American employees, I informed Gooch to get off the phone when I witnessed her making a call . . . , even though she informed me that it was an emergency." ECF No. 48-7 at 3.

[2] Gooch does not say who communicated the suspension.

Gooch contends that upon returning to work after her suspension, she was harassed with statements like, "You need more punishment," and "They did not fire you yet?" *Id.* at 7. On June 12, 2012, Gooch emailed Pineda about what she perceived as a campaign of racial discrimination. *Id.* After this email, Gooch was approached by general manager Monica Martin,[3] who "informed [Gooch] she was aware of [Bistro's] discriminatory practices . . . [and] that she had both witnessed the discrimination and heard that it was an ongoing issue and told [Gooch] that [she] was not the only employee [Bistro] was discriminating against." *Id.* Martin attempted to have Gooch speak with Bistro's lawyers, but Gooch told Martin that she had retained an attorney, to whom all communications on the matter should be directed. *Id.*

   F. *Retaliatory campaign culminates in Gooch's employment ending.*

Gooch asserts that, thereafter, Bistro management subjected her to a retaliatory campaign that consisted of verbally abusing her, issuing her pretextual write-ups, and intentionally interfering with her job. *Id.* at 7–8. Gooch received at least seven write-ups between July 5, 2012 and August 12, 2012, most of which she refused to sign, instead writing down explanations for why each write-up was unwarranted. ECF No. 43-2 at 7–15.

On September 12, 2012, Gooch was working as a cashier near the back door of the club. ECF No. 43-2 at 35. Three men tried to enter by the back door, which was unauthorized. *Id.* The parties dispute whether Gooch received adequate security assistance to handle the situation. *See* ECF Nos. 43-8 at 4; 43-2 at 42–43. An hour later, the men harassed a Bistro employee in the parking lot, and Gooch ran outside to intervene. She stated the situation made her fearful as "the area of the club has been robbed twice . . . ." *Id.*

Gooch states that this incident, combined with the preceding campaign of harassment, led her to experience stress-based medical problems. ECF No. 48-10 at 8. She took medical leave

---

[3] Martin is described in the complaint as the only employee at Bistro who "had the authority to hire, terminate, or discipline." ECF No. 1 at 7. Her title, "General Manager," is the same as that held by Jones.

5

immediately after the September 12 incident and applied for worker's compensation, but never received any payment. *Id.* at 8–9.

The parties dispute what caused Gooch not to resume working after that. Gooch avers that "[a]fter a few weeks on medical leave, I was medically cleared to return to work," but "[Bistro] repeatedly refused to place me back on the schedule. As a result . . . , I assumed I had been fired. As such, I applied for unemployment benefits. However, I was denied because [Bistro] maintained that I was still an employee." *Id.* at 9. Bistro, in its January 14, 2013 communication with the Nevada Department of Employment, wrote, "Since Ms. Gooch did not return to work . . . the company considers her to have quit her employment. At no time did management ever fire Ms. Gooch." ECF No. 43-2 at 35. Gooch was denied unemployment benefits on the basis that she "voluntarily quit." *Id.* at 36.

G. *Gooch files charge of discrimination with EEOC.*

Gooch filed a charge of discrimination with the EEOC and NERC on December 3, 2012. The charge states,

> On or about 10/01/2011, I was hired by the Respondent as a Cashier. My present position is a Cashier.
>
> During the course of my employment, I have been subject to disparate treatment. I was suspended by Tom Impastato (Manager) for weeks for a minor infraction (talking on the phone while at work). Tom was informed by upper management to terminate African American employees. . . .
>
> I believe that I was discriminated against due to my race, African American, and retaliated against, in violation of Title VII . . . .

ECF No. 43-8 at 11–12. Gooch's charge does not complain that she was wrongfully fired. Gooch was issued a right to sue letter on October 1, 2014. ECF No. 43-10 at 9.

II. ANALYSIS

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the initial burden of showing the absence of a genuine issue of material fact."

*Pioneer Chlor Alkali Co., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 863 F. Supp. 1237, 1239 (D. Nev. 1994) (citations omitted). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing version of events." *Id.* (citations omitted). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *Id.* (citations omitted). The non-moving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

### A. Discrimination against Gooch

For Gooch to sustain her claim for discrimination based upon race, she must offer either direct or indirect evidence of discrimination. Direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (internal citations omitted).

Impastato avers that Pineda, Gause, and Jones instructed him in meetings on June 5 and June 12, 2012 to fire the black staff. ECF No. 48-7 at 4. When he refused, he was fired on June 13. Impastato and other witnesses describe Gause as expressing this sentiment, as well as slightly less blatant racism, throughout his tenure at Bistro, which started in March 2012. *See* ECF Nos. 48-7 at 3; 48-5 at 2; 48-4 at 5. Impastato asserts that both Pineda and Jones were at least complicit in this racism, each individually chastising him for failing to fire or drive out black employees. ECF No. 48-7 at 4–5. This evidence would permit a reasonable fact-finder to conclude that discriminatory animus was more likely than not a factor in Gooch's two-week-long suspension, subsequent rash of write-ups, and Bistro's failure to put her back on the schedule after going on medical leave in September 2012.

Bistro responds that Shafer's conversation with Gause on June 22, 2012 "put to rest" the discrimination problem and therefore limits the window of evidence of direct discrimination.

ECF No. 43 at 10.  While this is possible, there remains a genuine issue of material fact as to whether it truly was "put to rest" or Bistro continued to be a racially discriminatory environment. The unusual number of write-ups issued to Gooch in the months of July and August are sufficient evidence to raise this question.

Bistro also states that it never fired Gooch, so there can be no claim for either discriminatory or retaliatory termination.  But the evidence could be interpreted to show that Gooch was constructively fired.  Gooch's employment at Bistro relied on being continuously assigned to the schedule.  She states that Bistro refused her attempts to be placed back on the schedule several weeks after she began medical leave. ECF No. 48-10 at 9.  The evidence does not conclusively disprove this.  The denial of Gooch's unemployment claim, which Bistro cites as external evidence that Gooch voluntarily quit, most likely occurred in large part because Bistro asserted that she voluntarily quit. *See* ECF No. 43-2 at 34–36.

Bistro lastly argues that, even if Gooch was constructively fired, she cannot maintain a claim on that basis because she did not exhaust her administrative remedies with EEOC or NERC. *See* ECF No. 43 at 17 (citing *B.K.B. v. Maui Police Dep't.*, 276 F.3d 1091, 1099 (9th Cir. 2002)).  Federal courts only have jurisdiction over claims actually investigated by EEOC "or which can reasonably be expected to grow out of the charge of discrimination." *B.K.B.*, 276 F.3d at 1099.  "[T]he court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case." *Id.*

This is a close question, as Gooch's EEOC charge of discrimination, filed on December 3, 2012, lists the dates of discrimination as May 16 to July 5, 2012, and does not assert that she was wrongfully fired. ECF No. 43-8 at 11–12.  The alleged firing was arguably "reasonably related" to her discrimination charges, in that Gooch portrays the firing as the culmination of a race-based campaign of discrimination.  On the other hand, Bistro is probably correct to say that, based on the wording in the charge, the EEOC could not be reasonably be expected to investigate a September–October firing.  Gooch's defense that this serious discrepancy is a "minute detail,"

or that it was a transcription error caused by NERC staff completing the charge form, is unpersuasive. ECF No. 48 at 20.  I nevertheless hold that Gooch did not fail to exhaust her administrative remedies because the state of her employment relationship with Bistro in the months following her medical leave is a matter of factual dispute.  The first definitive evidence that Gooch considered herself to have been constructively fired is her application for unemployment insurance, which she filed in January 2013.  It is arguable, then, that her claim for wrongful termination had not fully ripened by December 3, 2012, when she filed her charge of discrimination with the EEOC.

Bistro has not carried its burden of showing no genuine issue of material fact as to whether the discriminatory animus displayed in the June manager meetings was a but-for cause of Gooch's suspension, her unusual rash of write-ups, or her constructive termination.  I therefore deny Bistro's motions for summary judgment on Gooch's discrimination claim.

### B. Retaliation against Gooch and Impastato

A Title VII retaliation claim requires the plaintiff to show he engaged in a protected activity and his employer took an adverse employment action against him because of that activity.  Protected activity includes employee opposition to employment discrimination.  42 U.S.C. § 2000e-3(a); *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013).  For retaliation claims, the employee must show that that adverse action would not have occurred "but-for" the protected activity. *Nassar*, 133 S.Ct. at 2534.

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by showing the employer's explanation for the adverse actions was pretextual, such as by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Cummings v. Valley Health Sys., LLC*, No. 13-cv-00479-APG-GWF, 2016 WL 590455, at *4 (D. Nev. Feb. 11, 2016) (internal citation omitted).  "Additionally, causation may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision." *Id.* (citation omitted).

Bistro does not contest that both Gooch and Impastato complained about employment discrimination at Bistro. Impastato was clearly fired, which is an adverse employment action, and there remains a genuine fact question whether Gooch was fired. The only remaining issue is whether Bistro would have fired Gooch and Impastato but for their opposition to the alleged discrimination.

As to Impastato, there is clearly a genuine factual issue on that question. He was fired the day after the second of two meetings where he was instructed to fire or push out black staff but refused to. He was also told, in response to asking why he was fired, "Next time you are told to do something, do it." ECF No. 48-7 at 5. Even if Impastato had other deficiencies and his refusal to condone discriminatory practices was the last straw, it would nevertheless be a but-for cause. Bistro's argument that Impastato's incompetence had reached a crisis point is undermined by a May email from outside consultant Bob Johnson, who worked extensively with Impastato, stating that Impastato was "doing extremely well." ECF No. 48 at 9.

As to Gooch, her report to Martin of discriminatory conduct, as well as her insistence that communication on the issue go through her lawyer, was followed by an uncharacteristically dense series of write-ups, culminating three months later with her alleged constructive termination. The timing raises an inference that creates at least a genuine issue of fact as to whether this sequence of events was coincidental or an illegal retaliation.

Because the evidence raises a genuine dispute as to whether both Gooch and Impastato were retaliated against for protected activity, I deny Bistro's motion for summary judgment on Gooch's and Impastato's retaliation claims.

**C.  Unlawful deprivation of employment—Gooch**

A claim for unlawful discrimination under Nevada Revised Statutes § 613.330 is "assessed under the applicable federal anti-discrimination law." *Coburn v. PN II, Inc.*, 372 F. App'x 796, 798 (9th Cir. 2010) (citing *Apeceche v. White Pine Cty.*, 615 P.2d 975, 977–78 (Nev.1980)). Because the analysis of the state cause of action mirrors the Title VII analysis, I deny Bistro's motion for summary judgment on Gooch's Nevada unlawful discrimination claim.

**D. Tortious discharge—Impastato**

Federal Rule of Civil Procedure 56(a) requires a party moving for summary judgment to "identify[] each claim or defense . . . on which summary judgment is sought." Courts need not consider issues or arguments raised for the first time in a reply brief. *See, e.g.*, *Munoz v. InGenesis STGI Partners, LLC*, 182 F. Supp. 3d 1097, 1112 (S.D. Cal. 2016). Because Bistro did not address the tortious discharge claim in its motion for summary judgment, I deny the motion as to Impastato's tortious discharge claim.

**III. CONCLUSION**

IT IS THEREFORE ORDERED that Bistro's motion for summary judgment **(ECF No. 43) is DENIED**.

DATED this 31st day of March, 2017.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE